MORTON, Respondent, v. WILLIAM BARR DRY GOODS COMPANY, Appellant.

St. Louis Court of Appeals, June 11, 1907.

1. **MASTER AND SERVANT: Safe Place to Work: Delegating Duty: Independent Contractor.** The duty which a master owes his servant to use reasonable care to provide the servant with a reasonably safe place to work is a personal one and can not be delegated to an independent contractor; the negligence of an independent contractor in providing such safe place for a servant is the negligence of the master.

2. ———: ———: ———: **Negligence.** Where a servant was killed by the explosion of a blow off tank used for blowing off the master's boiler, and it was shown that the engineers employed by the master to install the machinery did not subject the lid of the tank to any kind of a test, and that the lid by the explosion was broken into several pieces and was found

to be defective, the widow of the servant killed, in an action for the death of her husband, made out a prima facie case of negligence on the part of the master by showing such facts.

3. ———: ———: ———: **Usual Appliances.** The rule that a master, in providing a safe place for his servant to work, performs his duty by furnishing appliances of ordinary character according to the usages and ordinary risks of the business, does not apply where the master employs skilled and competent mechanical engineers to inspect and test the appliances; in that case the negligence of such engineers is the negligence of the master.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*Seddon & Holland* for appellant.

(1) The court erred in refusing to give the peremptory instruction offered by appellant at the close of all the evidence, because there was no evidence to sustain any of the charges of negligence set up in respondent's petition. Laubheim v. Royal Netherlands S. Co., 107 N. Y. 228; Railroad v. Sullivan, 141 Ind. 83; Quinn v. Railroad, 74 Texas 713; Shea v. Wellington, 163 Mass. 365; LaBatt, Master and Servant, p. 326; Butler v. Townsend, 126 N. Y. 105; Burke v. Ireland, 59 N. E. 914. (2) The court erred in refusing to give instruction F offered by appellant. If the tank in question was made of the usual material, and was a standard tank, there was no negligence on the part of the appellant in using same. Minnier v. Railroad, 167 Mo. 97.

*Charles P. Johnson* and *Johnson, Houts, Marlatt & Hawes* for respondent.

(1) (a) The evidence sustains the charges of negligence in the petition. (b) The absolute duty which defendant owed to plaintiff's husband as an employee

to provide him a reasonably safe place to work and reasonably safe appliances could not be delegated. Herdler v. Range Co., 136 Mo. 16; Burnes v. Railroad, 129 Mo. 56; Sackawitz v. Biscuit Co., 78 Mo. App. 154; Bartley v. Trorlicht, 49 Mo. App. 231; Morton v. Railroad, 81 Mich. 423; Railway v. Herbert, 116 U. S. 647; 1 Labatt, Master and Servant, par. 153, p. 327; 2 Labatt, Master and Servant, par. 559, p. 1636; 4 Thompson on Negligence, par. 3763. (2) Instruction F offered by defendant was properly refused. (a) The instruction did not require that the "general use" should be by persons of ordinary reasonable prudence. Such qualification was necessary to make the instruction correct. Minnier v. Railroad, 167 Mo. 99; Curtis v. McNair, 173 Mo. 283; Kelly v. Parker Washington Co., 107 Mo. App. 495; Reichla v. Gruensfilder, 52 Mo. App. 43; 1 Labatt, Master and Servant, par. 44, p. 111; 4 Thompson, Negligence, par. 3770; Railroad v. Behymer, 189 U. S. 468; Nyback v. Lumber Co., 109 F. R. 738; Renne v. Leather Co., 107 Wis. 312; Railroad v. McDaniels, 107 U. S. 454; 1 Labatt, Master and Servant, par. 50, p. 122; Sawyer v. Shoe Co., 90 Me. 372; Austin v. Railroad, 93 Iowa 236; Redfield v. Railroad, 112 Cal. 224. (b) The instruction is erroneous in that it does not require the jury to find that the "general use" was under the same circumstances or conditions. 1 Labatt, Master and Servant, par. 53, p. 134; Redfield v. Railroad, 112 Cal. 224; Journeaux v. Stafford Co., 122 Mich. 402. (c) The jury had already been properly instructed upon the point involved. Lourimore v. Mfg. Co., 60 S. C. 153.

STATEMENT.—In 1902, the William Barr Dry Goods Company, of the city of St. Louis, built an addition to its department store, extending the same on Olive street through to Seventh street. The Dry Goods Company installed three boilers, in the basement of the addition, which were put in commission about the middle of De-

cember, 1902. Two blow-off tanks, thirty inches in circumference and thirty-six inches deep, sunk flush with the floor, were separately connected with the boilers by means of three-inch pipes, and were also independently connected with the sewer on Seventh street by a four-inch drainpipe to convey the water from the tanks to the sewer. The tanks and drainpipes were so adjusted as to prevent steam passing from the tanks into the sewer, and a three-inch steam of vapor pipe was attached to either tank for the purpose of carrying the steam from the tanks out through the roof of the building. The boilers were blown off every morning and evening into the blow-off tank. There were two valves, an upper and a lower, in each of the pipes connecting the tanks with the boilers. To properly blow off the boilers, the lower valves were first opened and then the upper ones were opened gradually. One of the tanks was within eighteen inches of the boiler that blew off into it. To get at the valves to blow off this boiler, the operator was obliged to stand on top of the tank, the cover of which was a circular piece of cast iron fitted into the flange of the tank and held down by an eight by ten inch manhead screwed to the tank by means of iron bolts.

Eugene Morton was employed by appellant as a fireman, and went on duty each day at six o'clock a. m. James Thomas, who was an assistant fireman for the company, went on duty at the same hour. On Monday morning, February 23, 1903, Morton, as was his custom, and in obedience to a standing order of the engineer in charge, opened the lower valve of the pipe leading from the boiler into the blow-off tank located within eighteen inches of it, and then commenced to turn the upper valve, when the tank exploded and blew him up. He fell across the tank and was dragged out by Thomas. The injuries caused by the explosion resulted in Morton's death. The action is by his widow.

The petition, after stating matters of inducement, continues as follows:

"Plaintiff states the said blow-off tank, so maintained by the defendant company, was weak and defective and made of inferior material, and was liable, on that account, to explode when steam and hot water from the boiler was conducted into said tank; and said defendant company, its agents and servants, knew or, by the exercise of reasonable care, might have known, that said tank was was weak and defective and made of inferior material and liable, on that account, to explode when steam and hot water from the boiler was conducted into said tank; that defendant company negligently and carelessly provided vents for the escape of steam from said blow-off tank which were to small to allow the safe escape of the steam admitted to said blow-off tank, and negligently and carelessly connected the steam escape pipe leading from said blow-off tank with the heating system and hot water heater in defendant's building, so that said steam escape pipe was liable to become wholly or partially stopped up with steam and hot water from said heating system and hot water heater and the free and safe escape of steam from said blow-off tank was liable to be thereby prevented; that on and for some time prior to the twenty-third day of February, 1903, said steam escape pipe was wholly or partially stopped up with steam and hot water from said heating system and hot water heater; all of which was well known to defendant or, by the exercise of ordinary care, might have been known to defendant in time to have remedied such defects and prevented the injury of plaintiff.

"And plaintiff states that on said twenty-third day of February, 1903, about five o'clock in the morning of said day, while her said husband, Eugene Morton, was in the exercise of his duties as fireman in the engine and boiler rooms of defendant's store, and while he was

exercising due care and caution to avoid injury, the said iron tank was exploded by the force of the steam and water conducted into it from the boilers, and plaintiff's husband, Eugene Morton, was burned, injured and killed by the escaping steam and water. Plaintiff states that the death of her said husband was caused by reason of the negligence of defendant company in maintaining said tank in its weak and defective condition and constructed of inferior material, as alleged aforesaid, and in providing vents from said blow-off tank which were too small, as aforesaid, and in using said blow-off tank and escape pipes after said escape pipes were stopped up or partially stopped up, as aforesaid."

The answer was a general denial, alleging as new matter, that Morton's injuries were caused by his own negligence in blowing off the boiler, by negligently opening the valve of the blow-off tank too suddenly and too far. The verdict was for plaintiff for three thousand dollars.

The evidence shows that a considerable amount of steam had been escaping around the rim of the blow-off tank which blew up, and the steam fitters, who put in the tank, were notified by appellant to make repairs; that on the Sunday previous to the explosion the steam fitters removed the head or lid of the tank and put a new gasket around its rim and replaced the lid, screwing it down tightly by means of the manhead and bolts. Thomas testified he was present when the lid was removed and noticed a blister about the size of a man's hand near the middle of it. The three workmen who did the job, testified they did not notice any defects in the lid, or any blister, and that the surface of the iron was smooth on both sides. The explosion caused the lid to break into seven or eight pieces and it was then discovered that it was honeycombed with sand or blow holes, covered over by smooth iron not thicker than paper in places. After the explosion, water from the

vapor pipe continued to flow in considerable quantities for several hours; its source is not accounted for, but it was shown that it had no connection with the hot water system by which the store was heated. The pipe run up a few feet, then horizontally twelve feet, making three turns at an angle of about forty-five degrees before going out through the roof, and was connected with the vapor pipe from the other tank. A great deal of expert evidence pro and con was introduced in respect to the size of the vapor pipe should have been. Respondent's evidence tends to show that it should have been at least twice as large as the pipe connecting the boiler and tank, while appellant's tends to show it was large enough and of the size ordinarily used on similar tanks in similar circumstances.

The evidence in respect to the proper and safe way of opening the valves of the blow-off tanks is not harmonious. Respondent's evidence tends to show the lower valve should be opened quickly for the purpose of getting a sudden pressure of water from the boiler to carry off the mud and scale; appellant's tends to show it should have been opened gradually to prevent the water hammering the tank and to prevent its filling up too rapidly and causing undue pressure. As to the upper valve, the witnesses agreed it should have been opened gradually; that it was not necessary to open it more than halfway, and that it would require about ten turns of the wheel to fully open it. Thomas testified that the explosion took place the very moment Morton placed his hand on the upper valve after opening the lower one, and that it was not more than one-third open.

The evidence shows that appellant employed a firm of experienced and reputable mechanical engineers to supervise the installation of its plant and it was installed under their supervision; that the firm who, under contract, put in the boilers and blow-off tanks had been in business in the city of St. Louis for many years and

was a reliable and reputable firm; that the steam fitters, who, under contract, put in the vapor pipe, were experienced and reliable; and there is not a scrap of evidence tending to show appellant contracted with any unskillful, incompetent or negligent firm to do any of the work in or about the installation of its plant. Appellant's evidence also tends to show its blow-off tanks are the same pattern, material and size in general use in the city of St. Louis, and that a great many of such tanks are in use in said city.

Neither of the consulting engineers testified, though one of the firm sat in the court room during the progress of the trial, and the evidence shows the firm had the pieces of the tank lid picked up shortly after the explosion and took them to its office, and retained them in its possession. There is no evidence showing or tending to show that the lid was ever tested by any one; on the contrary, it shows the lid was never subjected to any test.

At the close of all the evidence, appellant moved the court for a peremptory instruction to find for it.

BLAND, P. J. (after stating the facts)—1. That Eugene Morton lost his life through the culpable negligence of someone is beyond cavil or question; it is also equally clear, on the evidence furnished by respondent, that he was guilty of no negligence that directly contributed to his injury. Appellant's contention is that Morton's death cannot be attributed to its negligence, for the reason, being neither a manufacturer nor mechanical engineer, it did its full duty to furnish Morton a reasonably safe place to work, by contracting with experienced and reputable people in the business, to furnish and install its machinery and appliances under the supervision of competent mechanical engineers employed by it, and by having installed blow-off tanks of approved patterns and in common use, equipped

with such vents and outlets as are ordinarily used in like circumstances.    Whatever may be the rule in other jurisdictions, the law is well settled in this state that the master cannot delegate his duty to use reasonable care to furnish his servants with a reasonably safe place to work to an independent contractor.    This duty is a personal one, which he cannot shift to the shoulders of some one else by contract, or otherwise.    [Herdler v. Buck's Stove & Range Co., 136 Mo. 1. c. 16, 37 S. W. 115; Curtis v. McNair, 173 Mo. 1. c. 280, 73 S. W. 167; Burnes v. Railway, 129 Mo. 1. c. 56, 31 S. W. 347.] Labatt says: "It is a contradiction in terms to speak of an absolute duty as being susceptible of delegation;" and that the cases absolving the master from responsibility for the negligence of an independent contractor in this connection have been decided upon a false theory of the circumstances involved.    [2 Labatt, Master and Servant, sec. 559.]     Judge THOMPSON says:    "The duty of the master to exercise reasonable care to the end that the place in which his servant is required to work is reasonably safe is a primary duty of the master in the sense that it cannot be delegated, or that, if delegated, the person to whom it is delegated is the *alter ego* or vice-principal of the master, and that his negligence in the discharge of this duty is the master's negligence." [4 Thompson, Negligence, sec. 3763.]

In Northern Pacific R. R. Co. v. Herbert, 116 U. S. 1. c. 647-8, it is said: "It is the duty of the employer to select and retain servants who are fitted and competent for the service and to furnish sufficient and safe materials, machinery, or other means, by which it is to be performed, and to keep them in repair and order. This duty he cannot delegate to a servant so as to exempt himself from liability for injuries caused to another servant by its omission.    Indeed, no duty required of him for the safety and protection of his servants can

126 App—25

be transferred, so as to exonerate him from such liability."

In Bartley v. Trorlicht, 49 Mo. App. l. c. 231, Judge THOMPSON said: "The absolute duty of exercising reasonable care, to the end that the machinery and appliances placed in the hands of his servants will not endanger their lives or members, rests upon him equally, whether he attempts to exercise that duty through an independent contractor, through another servant, or by himself in his proper person."

In Sackewitz v. American Biscuit Co., 78 Mo. App. l. c. 154, it is said: "While for many purposes the relation of independent contractor will be recognized, it cannot be sustained to shield the master from those positive personal obligations cast upon him by his relation to his servant."

To apply the relation of independent contractor or that of a manufacturer to a contractor for structures or appliances, for the purpose of absolving the master from his duty to exercise reasonable care to provide his servant a reasonably safe place to work and with reasonably safe tools to work with, would be to leave the servant remediless if injured by reason of some dangerous property of tool or appliance, or some danger or defect in the place furnished him to work, since he would have no remedy against the independent contractor or the manufacturer who supplied the defective tool or appliance, or erected the defective structure. See note to Cleveland, C. C. & St. L. R. Co. v. Berry, 46 L. R. A. 38-45; The Joseph B. Thomas, Ib. 117-19. And it is a just rule which holds appellant liable for the death of Morton, if appellant was negligent in furnishing him an unsafe place to work, although it purchased the blow-off tanks from a reputable manufacturer and employed competent steam fitters to connect them with the boilers and to provide proper vents and outlets,

and although it employed competent engineers to super-
vise the installation.  Appellant's duty, a duty which it
could not shift to the shoulders of another, was to in-
spect the tanks and see that they were properly installed.
The tanks and their lids were of cast iron, and the
evidence shows (which is common knowledge) that in
making castings of iron, blow or sand holes are liable
to occur.  The lid of the tank which blew up was honey-
combed with these holes, and though it was designed
to withstand a considerable pressure of water and steam,
it was never tested.  Its sufficiency for the purpose for
which it was intended was demonstrated by the explo-
sion and the sad results following.  The evidence shows
conclusively that the lid was not subjected to any kind
of test.  In view of the use to which it was to be applied,
an ordinarily prudent person would have tested its
soundness before bolting it down to the top of the tank.
Its unsoundness, no doubt, would have been revealed
by tapping it lightly with a hammer, yet even this
simple test was not made.  This was negligence, or at
least evidence from which the jury were warranted to
find negligence; and a character of negligence which,
in the very nature of the relation of master and servant,
should be attributed to appellant.  [1 Labatt, Master and
Servant, sec. 57; Curtis v. McNair, supra.]  Appellant's
demurrer to the evidence was properly overruled.

2.   It is contended that the court erred in refusing
the following instruction asked by appellant:

"In reference to the charge that the blow-off tank
mentioned in the evidence was made of improper mate-
rial, the court instructs the jury that if you believe
from the evidence that tanks of the same material were
in general use at the time in question, and that this
was a standard tank, then and in that case there was
no negligence on the part of defendant in using that
kind of tank."

In support of this contention appellant cites Min-

nier v. Railway, 167 Mo. 99, 66 S. W. 1072; Chrismer
v. Bell Telephone Co., 194 Mo. 189, 92 S. W. 378. In
each of these cases the Supreme Court approved the
doctrine of the case of Titus v. Railroad, 136 Pa. St.
618, in which it is said: "All the cases agree that the
master is not bound to use the newest and best appli-
ances. He performs his duty when he furnishes those
of ordinary character and reasonable safety, and the
former is the test of the matter; for in regard to the
style of implement or nature of the mode of perform-
ance of any work, 'reasonably safe' means safe accord-
ing to the usages, habits, and ordinary risks of the
business. Absolute safety is unattainable, and employ-
ers are not insurers. They are liable for the conse-
quences, not of danger but of negligence; and the un-
bending test of negligence in methods, machinery, and
appliances is the ordinary usage of the business. No
man is held by law to a higher degree of skill than
the fair average of his profession or trade, and the
standard of due care is the conduct of the average pru-
dent man. The test of negligence in employers is the
same, and however strongly they may be convinced that
there is a better or less dangerous way, no jury can
be permitted to say that the usual and ordinary way,
commonly adopted by those in the same business, is
a negligent way for which liability shall be imposed.
Juries must necessarily determine the responsibility of
individual conduct, but they can not be allowed to set
up a standard which shall, in effect, dictate the cus-
toms or control the business of the community." The
doctrine of these cases is inapplicable to the facts of
the case in hand. Appellant is not in the situation of
a master who buys of a reputable manufacturer, and
appliance or implement in common use and in apparent
perfect order but which really has a hidden defect not
discoverable by ordinary tests, by reason of which hid-
den defect the servant is injured after the implement

has been put into his hands to work with by the master. But occupies the position of a master, who, to install machinery and appliances upon his premises to be afterwards operated by his servants, does not rely upon manufacturers and contractors to furnish him suitable machinery and safe appliances, but employs skilled and competent mechanical engineers to select, inspect and test the machinery and appliances to be furnished by the manufacturers and contractors and to supervise their installation. The mechanical engineers employed by appellant were its agents, its alter ego, and their negligence was the negligence of appellant and it is liable for the consequences flowing therefrom. [Miller v. Railway, 109 Mo. 350, 19 S. W. 58.] That the engineers were negligent in failing to test the head of the blow-off tank which blew up and caused Morton's death, does not admit of doubt. It was appellant's duty to do what it undertook to do by its agents, ie., to supervise the installation of its machinery and appliances for the purpose of furnishing its servants to be thereafter employed a safe place to work. The duty was a personal one which it could not delegate to a contractor or employe (Sackewitz v. Am. Biscuit Mfg. Co., 78 Mo. App. 144; Huth v. Dohle, 76 Mo. App. 671; Zellars v. Missouri Water & Light Co., 92 Mo. App. 107) so as to avoid responsibility for an injury to its servants, caused by a defect in one of its appliances which could have been detected by a simple and ordinary test. As is said in the case of Balt. & Ohio Railroad v. Baugh, 149 U. S. l. c. 386, "It is the master who is to provide the place and the tools and the machinery, and when he employs one to enter into his service he impliedly says to him that there is no other danger in the place, the tools and the machinery, than such as is obvious and necessary. Of course, some places of work and some kinds of machinery are more dangerous than others, but that is something which inheres in the thing itself,

which is a matter of necessity and cannot be obviated. But within such limits the master who provides the place, the tools and the machinery owes a positive duty to his employee in respect thereto.  That positive duty does not go to the extent of a guaranty of safety, but it does require that reasonable precautions be taken to secure safety, and it matters not to the employe by whom that safety is secured, or the reasonable precautions therefor taken.  He has a right to look to the master for the discharge of that duty, and if the master instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employe, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects."  This is approvingly cited in the case of Union Pacific Railway Co. v. Daniels, 152 U. S. 1. c. 689.  See also Elmer v. Locke, 135 Mass. 575; Meyers v. Hudson Iron Co., 150 Mass. 125; Hall v. Railway, 74 Mo. 298; Coontz v. Railway, 112 Mo. 652; Bridges v. Railway, 6 Mo. App. 389; 1 Shearman & Redfield on Negligence, sec. 194, and cases cited in footnote 16.

We conclude that the court did not err in refusing appellant's instruction and affirm the judgment.  All concur.